727 So.2d 555 (1998)
Claudette C. SIMPSON
v.
Shari Simpson GOODMAN and Karl Goodman
No. 97 CA 2675.
Court of Appeal of Louisiana, First Circuit.
December 28, 1998.
*557 Jean-Paul Layrisson, New Orleans, for Plaintiff/Appellee, Claudette C. Simpson.
David J. L'Hoste, New Orleans, for Defendants/Appellants, Shari Simpson Goodman and Karl Goodman.
Before: SHORTESS, C.J., CARTER, and WHIPPLE, JJ.
CARTER, J.
Plaintiff, Claudette Simpson was involved in an automobile accident in Colorado in early April 1985. Her husband, Dr. John Simpson, and one of their six daughters were killed in the accident. Mrs. Simpson sustained numerous broken bones and a severe head injury in the accident. She remained unconscious in a Colorado hospital for several weeks. In late April 1985, Mrs. Simpson was transferred to East Jefferson Hospital in Metairie. She spent three to four more weeks in East Jefferson Hospital before being released in May.
After the accident, it was discovered that there were two $3,000,000.00 life insurance policies in effect that covered Dr. Simpson at the time of his death. Mrs. Simpson was the beneficiary on both policies. Apparently, the first three million dollar policy was supposed to have been cancelled and replaced with the second three million dollar policy. However, by mistake, the premiums were paid on both policies. Consequently, when Dr. Simpson died, both policies were in effect.
When Mrs. Simpson learned about the unexpected three million dollars in life insurance benefits, she expressed a desire to transfer the extra three million dollars in benefits to her remaining six children. Therefore, she began making numerous gifts to her children with the advice of financial advisors and the family's certified public accountant, Dennis Frentz. Mrs. Simpson created a revocable trust in September 1985, which was funded with $1,500,000.00 of the six million dollars in insurance benefits. The six children were the beneficiaries of the trust. In 1986, Mrs. Simpson gifted approximately $1,088,000.00 to her children, their spouses and her grandchildren. As a result of these gifts, Mrs. Simpson incurred federal and state gift tax liability totaling approximately $193,000.00.
In July 1985, Mrs. Simpson provided her daughter and son-in-law, defendants, Shari and Karl Goodman, with a check for $80,000.00 to purchase and renovate a home in Yazoo City, Mississippi. One of the disputes in this appeal is whether the $80,000.00 was intended to be a loan or a gift. It is undisputed that the transaction was set up as a loan; however, defendants contend that Mrs. Simpson was supposed to forgive portions of the debt with the passage of time. Defendants assert that the forgiveness of the debt was going to be accomplished by reducing the principal balance on the loan by $30,000.00 a year. This figure represented the value of the ten thousand dollar per person annual gift tax exclusion. The Goodmans *558 referred to these annual principal reductions as "click-offs."
Shari and Karl made monthly payments on the house "loan" to Mrs. Simpson, although some of the payments were late. These payments were made with fair regularity until 1993, and one additional payment was sent in 1994. There was testimony at trial that shortly before the last payment was made by Shari, Shari learned that Mrs. Simpson had revoked the revocable trust which had been set up in favor of the children. However, Shari testified that she learned about the revocation in 1991, shortly after the revocation was executed, through a letter to the trustees on which all of her siblings were copied. But, Joey Simpson testified that he did not learn of the revocation until 1994. Mrs. Simpson's reason for revoking the trust was that she was lacking sufficient funds to support herself.
In the fall of 1985, Mrs. Simpson also provided her children with the funds to purchase a life insurance policy on Mrs. Simpson's life, which policy was placed in an irrevocable trust with the children listed as the beneficiaries. The cost of this policy was approximately $240,000.00. Accordingly, $40,833.33 was paid by Mrs. Simpson on behalf of each of her six children. The classification of this transaction as a loan or a gift is also disputed by the parties.
In February 1994, Mrs. Simpson sought the assistance of her new accountant, Kevin Neyrey to collect the loan payments from defendants. After efforts to collect the overdue payments from defendants failed, Mrs. Simpson filed suit against Shari and Karl seeking to collect the balance owed on the loan of the $80,000.00 for the house and the $40,833.33 for the life insurance policy. The Goodmans answered the petition claiming that the $80,000.00 and $40,833.33 were gifts and not loans; thus, Shari and Karl contended they did not owe Mrs. Simpson any money.
After a trial, the trial court rendered judgment in favor of plaintiff for $87,850.96, plus court costs, expert witness expenses and fees, and legal interest. In its reasons for judgment, the trial court concluded that the transfer of $80,000.00 by Mrs. Simpson to the Goodmans was a true loan, and not a gift. Thus, the trial court rejected the defendants' argument that Mrs. Simpson had allowed defendants to take several reductions in the principal balance of the loan. In reaching this judgment amount, the trial court concluded that defendants were entitled to $56,653.92 in credits for the amounts previously paid by defendants, as evidenced by cancelled checks. However, the trial court found that the $40,833.33 used to purchase the insurance policy was a gift and not a loan. Defendants appealed from the judgment asserting two assignments of error: 1) the trial court erred in finding that the money provided for the house was a loan and alternatively, 2) if the trial court was correct in its classification of the $80,000.00 transaction as a loan, it erred in not giving the defendants a credit for the interest payments made on the loan in 1986. Plaintiff answered the appeal arguing that the trial court erred in finding the $40,833.33 for the insurance policy was a gift and not a loan, and in not taxing all of the expert witness fees to the Goodmans.

STANDARD OF REVIEW
All of the assignments of error involve credibility determinations and findings of fact by the trial court. Accordingly, in reviewing the evidence, we are guided by the manifest error-clearly wrong standard, which authorizes us to reverse a trial court's factual finding only if we find from the record that a reasonable factual basis does not exist for the finding of the trial court and that the record establishes that the finding is clearly wrong. Stobart v. State, Through Department of Transportation and Development, 617 So.2d 880, 882 (La.1993); Mart v. Hill, 505 So.2d 1120, 1127 (La.1987). Thus, the reviewing court must do more than simply review the record for some evidence which supports or controverts the trial court's finding. The reviewing court must review the record in its entirety to determine whether the trial court's finding was clearly wrong or manifestly erroneous. Stobart v. State, Through Department of Transportation and Development, 617 So.2d at 882.
*559 The issue to be resolved by the reviewing court is not whether the trier of fact was right or wrong, but whether the fact finder's conclusion was a reasonable one. Stobart v. State, Through Department of Transportation and Development, 617 So.2d at 882. Even though an appellate court may feel its own evaluations and inferences are more reasonable than the fact finder's, reasonable evaluations of conflicting testimony, such as through credibility determinations, and reasonable inferences of fact should not be disturbed upon review where conflict exists in the testimony. Where two permissible views of the evidence exist, the fact finder's choice between them cannot be clearly wrong. Stobart v. State, Through Department of Transportation and Development, 617 So.2d at 882-83. However, where documents or objective evidence so contradict the witness's story, or the story itself is so internally inconsistent or implausible on its face, that a reasonable fact finder would not credit the witness's story, the court of appeal may well find manifest error or clear wrongness even in a finding purportedly based upon a credibility determination. Rosell v. ESCO, 549 So.2d 840, 844-45 (La.1989).

PROPER CLASSIFICATION OF THE HOUSE "LOAN"
The Goodmans contend that the $80,000.00 check which plaintiff wrote to them in July 1985 was a gift, even though it was purposefully set up as a loan. Defendants allege that the reason for setting up the transaction as a loan was to avoid having to pay gift taxes on the alleged donation from plaintiff to defendants. According to defendants, Mrs. Simpson allowed defendants to take reductions in the principal balance of the loan in 1987, 1988, and 1989, by the amounts which she could legally gift to defendants annually without incurring any gift tax liability. Because defendants had one child during 1987 through 1989, they contend the principal balance of the loan was reduced by $30,000.00 per year in each of these three years. The Goodmans thus conclude that they overpaid the $80,000.00 loan from plaintiff.
Plaintiff asserts that she only intended to loan her children money to buy or build homes, not to give them the money. Furthermore, plaintiff testified that if she wanted to give defendants and their son $10,000.00 each per year, she would have written them a check for this amount, rather than gifting them something which could only be realized on paper. Mrs. Simpson denied telling defendants that they could "click-off" portions of the debt owed to plaintiff or that she forgave any part of the debt owed to her by defendants.
Mrs. Simpson's certified public accountant, Kevin Neyrey, testified that his services were obtained by Mrs. Simpson in late 1991, because Mrs. Simpson was concerned about her personal finances and the administration of Dr. Simpson's estate. Mr. Neyrey was asked to prepare Mrs. Simpson's individual tax return for 1991. Mrs. Simpson informed Mr. Neyrey that she loaned money to the Goodmans so they could purchase a house. Thus, in July 1992, Mr. Neyrey wrote to defendants requesting an amortization schedule and schedule of payments on the house loan. Karl, a CPA himself, prepared and sent Mr. Neyrey an amortization schedule in August 1992. According to the schedule prepared by Karl, the first payment on the loan was made in January 1991, although Mr. Neyrey noted from previous years' tax returns that interest on the loan had been reported by both parties in prior years.
In 1994, Mrs. Simpson asked Mr. Neyrey to handle the collection of the loan payments from defendants. When Mr. Neyrey contacted Shari to inform her of this request, Shari became enraged and told Mr. Neyrey she did not think she had to pay the loan back because Mrs. Simpson had revoked the trust.
Mr. Neyrey believed the house loan was a true loan for the following reasons: 1) Mrs. Simpson reported interest income on the loan to the IRS; 2) the Goodmans took tax deductions on their IRS tax returns for the interest they paid on the loan; 3) in the four years for which Mr. Neyrey has tax returns for both Mrs. Simpson and the Goodmans, the numbers for the respective mortgage interest income and deductions regarding the *560 Goodmans' home match; and 4) based on the cancelled checks, the Goodmans made payments on the loan for seven years before ceasing payments. Mr. Neyrey was unaware of any remission or "click-off" of the principal balance of the loan from Mrs. Simpson to the Goodmans. He testified that Mrs. Simpson told him that she did not allow any "click-offs." Moreover, pursuant to IRS regulations, a person cannot take the home mortgage interest deduction on their taxes without a real or bona fide debt. Also, the principal balance could not be reduced by any annual gift to the Goodmans' child because the child is not a party to the obligation between Mrs. Simpson and the Goodmans. Finally, if the Goodmans had been authorized by Mrs. Simpson to take a $30,000.00 reduction in principal in 1987, 1988, and 1989, the loan would have been paid off as of 1991. Yet, the Goodmans continued to make regular payments until 1993, and the amortization schedule prepared by Karl in 1992, failed to reflect any click-offs, nor did it indicate that the loan should have been completely paid by 1991.
Dr. and Mrs. Simpson's daughter, Suzette Richard also testified. Suzette testified that Shan informed her after the accident that Mrs. Simpson would act as a bank for any of the children wanting to borrow money to build a home. There was no mention of these loans actually being gifts, or of setting up these transactions as loans to funnel money to the children without incurring gift tax liability. Shari told Suzette that she quit paying on the home loan to Mrs. Simpson because Mrs. Simpson had revoked the trust; thus, Shari felt that Mrs. Simpson actually owed her money. Suzette also borrowed money from plaintiff to build a house and continues to pay the loan back. Finally, Suzette acknowledged her mother's generosity in gifting substantial sums of money to all the children in 1986. Suzette believed approximately 1.1 million was donated in 1986, and that on another occasion, Mrs. Simpson gifted $10,000.00 to each child, spouse and grandchild.
Mrs. Simpson testified that she agreed to loan the Goodmans money to buy a house in Yazoo City and that her daughter Shan McDaniel agreed to handle the loan documentation. At some point, Mrs. Simpson offered Shari and Karl a "sabbatical" from payments for a few months, which offer was eventually accepted by the Goodmans. However, Mrs. Simpson denied telling Shari and Karl that they could "click-off" portions of the debt they owed to her, or that she forgave any of this debt. After Mrs. Simpson revoked the revocable trust at the advice of her financial advisors, Shari informed Mrs. Simpson that Mrs. Simpson would have to sue Shari and Karl to get the loan repaid.
Mrs. Simpson also testified that she loaned money to her son Joey and her daughter Suzette to build homes. Both Suzette and Joey were still making loan payments to Mrs. Simpson at the time of the trial. At some point during the life of the house loan to Joey, Mrs. Simpson noticed that the amounts of Joey's payments varied. When Mrs. Simpson asked Shan about this variance, Shan mentioned that Joey was deducting $10,000.00 in annual gifts for himself, his wife and children from the principal balance of his loan. Mrs. Simpson objected to this practice, stating that if she was going to give $10,000.00 to any of her children, she wanted to do it with the tender of a check.
Joey Simpson testified that his mother expressed her intent to share the extra three million dollars in insurance benefits with the children. He acknowledged that Mrs. Simpson set up a revocable trust with one and a half million dollars to which the children were the beneficiaries. Joey further acknowledged that he borrowed $145,000.00 from his mother in late 1985, to build a house. However, he testified that he planned to utilize annual "click-offs" of $10,000.00 per child, spouse or grandchild to pay off the loan for his house. Joey admittedly has no documentation to reflect he received "click-offs" from 1987 through 1989. He could not explain why he waited until 1991 to put forth any evidence of principal reductions in 1987 through 1989. Joey could not recall if it was Mrs. Simpson or Shan who gave him the choice between annual cash gifts and a reduction in the principal balance of the loan. Finally, when informed on cross examination that the family accountant, Dennis Frentz *561 considered the house "loans" to be real loans, Joey stated, "Well, well, then they are real loans."
Karl Goodman testified that he and Shari borrowed $80,000.00 from Mrs. Simpson to buy their home in Yazoo City, Mississippi. He admitted preparing an amortization schedule on the house loan in 1992, and that the amortization schedule does not reflect the alleged "click-offs" or principal reductions in 1987 through 1989. He explains that he did not know the balance of the loan when he prepared the amortization schedule. Karl considered the loan to be real and he was never personally told by Mrs. Simpson that portions of the debt could be "clicked-off." However, he believed the debt would be forgiven over time.
He acknowledged that the insurance declarations sheet on the Yazoo City property listed Mrs. Simpson as the mortgagee. Regarding why Karl and Shari ceased making payments in 1994, Karl denied that the revocation of the revocable trust was the reason. Karl testified that he also prepared an amortization schedule which reflects the reductions in principal claimed by defendants. He did not state when this subsequent amortization schedule was prepared, although it reflects payments through 1994. According to this subsequent amortization schedule, the loan was fully repaid in July 1991, and as of February 1994, the date of their last payment on the loan, the Goodmans had overpaid by $20,743.44. Yet, the Goodmans did not assert any claim to a refund of this alleged overpayment.
Shari Goodman asserted at trial that they had to submit payments on the loan to keep the IRS from coming back against them. She contended that the house loans were a means to getting the three million dollars to the children without incurring significant gift tax liability. Shari admitted that Mrs. Simpson gifted about 1.2 million dollars to the children in 1986, and that when this amount was added to the related gift tax liability and the one and a half million dollars which was placed in the revocable trust, the total was approximately three million dollars. According to Shari, plaintiff wanted each child to be treated the same. Yet, Shari acknowledged her uncertainty as to whether Mrs. Simpson made $10,000 .00 gifts to all of the children in 1987, 1988, and 1989.
Regarding cessation of the loan payments, Shari denied that the revocation of the trust caused the cessation, and instead asserted that she quit paying in the middle of 1993 because she believed she did not owe Mrs. Simpson any more money on the loan. Yet, Shari admitted being unhappy about the revocation of the trust and angry about the suit filed by Mrs. Simpson against Shan regarding the handling of Dr. Simpson's succession. Like her brother Joey, Shari lacks any written documentation that she was entitled to "click-offs" of the principal loan balance. Shari acknowledged that the family accountant, Dennis Frentz, considered this house loan to be real.
Plaintiff's daughter, Shan also testified at the trial. Shan asserted that the $80,000.00 loan to the Goodmans was set up as a loan instead of a gift for tax reasons. Yet, like Shari, Shan acknowledged that the total of the 1986 donations to the children and their families, the money placed in the revocable trust, the gift taxes paid on the donations and the $240,000.00 used to purchase an insurance policy on Mrs. Simpson's life totaled slightly over three million dollars, which was the sum that Mrs. Simpson initially intended to transfer to the children. Shan also admitted that she had no authority to manage her mother's money. Finally, Shan did not think her mother made $10,000.00 gifts to all of the children in 1987, 1988, and 1989.
Strong and convincing proof is necessary to establish a donation. The donee bears the burden of proving an alleged donation. See T .L. James & Co., Inc. v. Montgomery, 308 So.2d 481, 485 (La.App. 1st Cir.), affirmed in part and reversed in part, 332 So.2d 834 (La.1975). Pursuant to LSA-C.C. art. 1846, "[w]hen a writing is not required by law, a contract not reduced to writing ... for a value not in excess of five hundred dollars may be proved by competent evidence. If the ... value is in excess of five hundred dollars, the contract must be proved by at least by one witness and other corroborating circumstances." (Emphasis added.)
*562 The trial court was not clearly wrong in finding that the $80,000 .00 was a loan and not a gift. The transaction was undisputedly set up as a loan and treated like a loan by both plaintiff and the defendants. Defendants made payments on the loan regularly for at least six or seven years; defendants claimed the interest paid on the loan as a mortgage interest deduction on their tax returns from 1986 through at least 1991. Mrs. Simpson claimed the same amount of interest as income on her tax return from 1988 through 1993.[1] She had also loaned money to two other children for the purpose of purchasing or constructing homes, and the evidence at trial established that these two children were making regular payments on these loans. Karl prepared an amortization schedule on the loan in 1992, which reflected payments being owed until the loan was paid off in 2020. Thus, we agree with the trial court that defendants did not carry their burden of proving that plaintiff intended the $80,000.00 "loan" to be a gift.
However, defendants further contend that Mrs. Simpson intended to remit portions of the principal balance of the loan in the years 1987, 1988, and 1989. The affirmative defense of remission of a debt is never presumed unless it clearly appears that a creditor intended it. The one claiming the benefit of a remission, express or tacit, has the burden of proving the remission. Arledge v. Bell, 463 So.2d 856, 858 (La.App. 2nd Cir.1985). Only the obligee can grant a remission of debt. See LSA-C.C. arts. 1888 and 1890.
There was no clear evidence that Mrs. Simpson granted "click-offs" to defendants. If defendants were entitled to "click-offs," the loan would have had a zero balance by 1991. Yet, the defendants made payments on the loan as late as 1994. The record contains testimony to support a finding that the only reasons defendants ceased paying in 1993 were to retaliate against plaintiff for revoking the revocable trust and for bringing suit against Shan for mismanagement of Dr. Simpson's estate. Moreover, the amortization schedule prepared by Karl in 1992 did not reveal any annual reductions in principal. Accordingly, we cannot say the trial court was clearly wrong in finding that the $80,000.00 check was a true loan and not a gift. This assignment of error is without merit.

DEFENDANTS' ENTITLEMENT TO A CREDIT FOR 1986 INTEREST PAYMENTS
Defendants also argue that the trial court erred in not awarding them credit for interest payments allegedly made on the loan in 1986. The trial court refused to give credit for these alleged payments because there was insufficient proof of the payments in the record. We find no clear error in not awarding credit for payments made on the loan in 1986.
Although defendants' 1986 income tax return reflected mortgage interest payments in 1986, plaintiff's return for 1986 was not part of the evidence. Defendants failed to produce cancelled checks for this period of time, and they failed to testify about the absence of these cancelled checks. Although there was hearsay testimony in the form of the deposition of Mrs. Simpson's expert witness, Kenneth Abney, CPA, that checks reflecting the 1986 payments were lost in a flood, defendants did not testify to this fact at trial. Nor did the Goodmans positively testify that they made interest payments in 1986. Thus, we cannot say the trial court committed manifest error in not crediting defendants for interest payments allegedly made in 1986. This assignment of error is meritless.

PROPER CLASSIFICATION OF THE INSURANCE PREMIUM "LOAN"
Mrs. Simpson answered defendants' appeal and argues that the trial court erroneously classified $40,833.33 as a gift. The $40,833 .33 was used by the Goodmans to pay for their portion of an insurance policy purchased by the children on the life of Mrs. Simpson.
*563 After meeting with the Simpson family financial advisors, a decision was made to purchase a life insurance policy on Mrs. Simpson's life to fund the tax liability which would be incurred by Mrs. Simpson's estate upon her death. The cost of this insurance policy was approximately $240,000.00. Thus, the cost of the premium was transferred from one of Mrs. Simpson's accounts into an irrevocable trust which was set up in the fall of 1985 to purchase and own the life insurance policy. Mrs. Simpson also underwent a physical examination in the fall of 1985 for the purpose of obtaining this insurance policy.
Dennis Frentz, the Simpson family accountant, testified that it was his understanding that each child would not have to repay their respective $40,833.33 portion of the premium. Joey Simpson testified that his mother gifted the insurance premium money to her children. While Mrs. Simpson did not remember giving each child approximately $40,000 for a life insurance policy, she also did not recall receiving any payments from any of the children on any $40,000.00 loans. Suzette stated she never received $40,000.00 from her mother and accordingly, concluded that such sum was never loaned to her. However, the record is clear that the money used to purchase the insurance policy did not go to each child directly, but rather was transferred to the life insurance trust, which in turn purchased the policy. Thus, the transfer of $40,833.33 per child was on each child's behalf, rather than to each child directly.
Additionally, the tax returns of Mrs. Simpson only reflect the receipt of interest income from three of her children, the same three who borrowed money from Mrs. Simpson to purchase or build homes. Thus, it appears that none of the children were repaying any life insurance premium loans. Finally, it is undisputed that Mrs. Simpson intended to gift three million dollars of the six million dollars in insurance benefits to her children, their spouses and her grandchildren. The total of the 1986 cash donations, the $1,500,000.00 placed in the revocable trust, the $240,000.00 life insurance premium and the related gift taxes on these transactions equaled approximately three million dollars.
After a review of the record in its entirety, we are unable to say the trial court was manifestly erroneous in concluding that the $40,833.33 given on behalf of the Goodman's for the purchase of the insurance policy was a gift and not a loan. Thus, this assignment of error is meritless.

ASSESSMENT OF EXPERT WITNESS FEES
Mrs. Simpson complains that the trial court erred in not taxing the expert witness fee of Kenneth Abney to the defendants. Mrs. Simpson cites to LSA-R.S. 13:3666 to support this contention. Under LSA-R.S. 13:3666 and LSA-C.C.P. art. 1920, the trial judge has great discretion in awarding costs, including expert witness fees, deposition costs, exhibit costs and related expenses. Bourgeois v. Heritage Manor of Houma, 96-0135, p. 4 (La.App. 1st Cir.2/14/97); 691 So.2d 703, 706. Generally, the amount and fixing of expert fees lies within the sound discretion of the trial court and will not be disturbed in the absence of an abuse of discretion. See LSA-C.C.P. art. 1920; Bourgeois v. Heritage Manor of Houma, 691 So.2d at 709; Autin's Cajun Joint Venture v. Kroger Company, 93-0320, p. 10 (La.App. 1st Cir.2/16/94); 637 So.2d 538, 544, writ denied, 94-0674 (La.4/29/94); 638 So.2d 224. We find no abuse of discretion in the instant case. Therefore, this assignment of error has no merit.

CONCLUSION
For the reasons set forth in this opinion, the judgment of the trial court is affirmed. Costs of this appeal are assessed to Karl and Shari Goodman.
AFFIRMED.
NOTES
[1] The income tax returns of the Goodmans for 1992, 1993, and 1994 were not part of the record; nor were Mrs. Simpson's income tax returns for 1986, 1987, and 1994.