752 So.2d 375 (2000)
Rhonda KUGLER, et al.
v.
TANGIPAHOA PARISH SCHOOL BOARD, A Louisiana Governmental Body, XYZ Insurance Company, Harold "Doe", and Christine Terral.
No. 99 CA 0016.
Court of Appeal of Louisiana, First Circuit.
February 18, 2000.
*377 Page McClendon, Ponchatoula, for Plaintiff Appellee Rhonda Kugler.
Christopher Moody, Hammond, for Defendant Appellant Tangipahoa Parish School Board.
Before: FOIL, WHIPPLE and GUIDRY, JJ.
FOIL, J.
This appeal challenges various aspects of a trial court's liability and quantum determinations. After a thorough review of the record, we affirm.

FACTUAL AND PROCEDURAL BACKGROUND
On March 30, 1993, Rhonda Kugler was injured while helping to assemble a stage for an upcoming Easter play at Tucker Elementary School. Mrs. Kugler routinely volunteered as a helper for her son's first grade teacher, Christine Terrell. On the morning in question, Mrs. Terrell asked Mrs. Kugler to assist in the stage assembly, which was being undertaken by several other volunteer parents in the school's cafeteria.
The record reflects that the stage was comprised of 6-8 large pieces of press board supported by short legs. The individual pieces were approximately 8 feet long. Witnesses described the boards as being anywhere from 4-7 feet wide and weighing from 60-150 pounds. The stage came with a cart for storing the pieces. The cart, which was on wheels, was about 6 feet long with 4 foot sides.
According to Mrs. Hillary Allen, the school's principal, the school had a policy prohibiting anyone except the custodial staff from handling the stage assembly. The principal and janitors acknowledged the pieces were heavy, bulky and required assembly in a certain order. According to head janitor Yvonne Schliegelmeyer, the cart was placed out of the way in a secure place so that no one would come into contact with it. The record reflects that prior to the accident, the cart was located against a wall in the cafeteria, and its movement was blocked by a row of chairs.
When Mrs. Kugler arrived in the cafeteria, five volunteer parents were in the process of assembling the stage. The participants had been carrying the heavy pieces from the cart to the center of the cafeteria where the play was to be held. At some point, someone suggested that the cart be moved to the center of the cafeteria near the stage.
Following the movement of the cart to the center of the room, Mrs. Kugler was standing on one side of the cart as several parents attempted to remove the fourth or fifth partition. The cart became top-heavy and toppled onto Mrs. Kugler. As Mrs. Kugler attempted to catch a falling stage piece, one of the boards fell onto her right hand and foot. As a result, Mrs. Kugler suffered a laceration and fracture to her right index finger, along with a badly bruised foot and knee.
*378 Mrs. Kugler and her husband filed this lawsuit seeking damages against the Tangipahoa Parish School Board. At trial, the movement of the cart from its secure location against the wall to the center of the cafeteria was the central point of dispute. Head janitor Yvonne Schliegelmeyer attested that stage assembly had always been handled in the past by the custodial staff. On several occasions the custodians attempted to roll the cart with its pieces to the site where the stage was to be located. However, the cart became top-heavy if the pieces were taken off of it after it had been moved from the wall. For this reason, she stated, the cart was left against a wall and the janitors took pieces off of the cart and carried them across the floor to wherever the stage was to be located. Ms. Schliegelmeyer testified Harold Coleman, a janitor who worked under her supervision, had been involved in this procedure during past stage set-ups, and acknowledged Mr. Coleman would have to be aware of the problem with the cart.
In a deposition, Mr. Coleman acknowledged the cart was very limber and weak, and its weight tended to shift to one side. He stated the cart had wheels and to move it away from the wall, one would have to unlock the wheels.
Mr. Coleman denied having anything to do with moving the cart, insisting the cart was already in the center of the room when he arrived at the cafeteria. He testified that shortly before the accident, he had been mopping when he entered the cafeteria and saw the parents putting the stage together. He admitted he was aware that only the custodial staff was allowed to assemble the stage. However, he did not think it was his responsibility to prevent the parents from assembling the stage, and he watched them for about two to three minutes before the accident occurred.
The head janitor gave a different account. She stated that someone told her the parents were assembling the stage in the cafeteria, and she asked the parents to cease until she got clearance from the principal, Mrs. Allen. She attested that she and Mr. Coleman went to the principal's office together, where Mrs. Allen ordered Mr. Coleman to go to the cafeteria to stop the parents from erecting the stage. However, Mrs. Allen stated the head janitor was already in her office when Mr. Coleman came in to report that parents were assembling the stage.
Several participants in the stage assembly testified Mr. Coleman was present the entire time the stage was being assembled. Plaintiff testified Mr. Coleman advised the parents to move the cart to the center of the room, and he assisted the parents in moving the cart. Two other parents, Patricia Fussell and Margaret Decota, testified Mr. Coleman moved the cart from the wall to the center of the room. At no time, these participants testified, did Mr. Coleman warn them of the danger that the cart may become unstable as the partitions were removed.
At the conclusion of the evidence, the trial judge found as a fact that Harold Coleman moved the cart. Although the school may have had a policy prohibiting parents from assembling the stage, the judge noted, the parents were never informed of the policy. The judge concluded Mr. Coleman should have warned the parents of the danger presented by the cart and certainly should not have participated in the dangerous activity by moving the cart. As such, he found the school breached the standard of reasonable care and was therefore liable. The judge also felt the cart itself was defective, as the removal of several pieces therefrom could cause the cart to become unstable and topple overthe precise danger occurring in this case.
Plaintiff was awarded $30,000.00 in general damages and $1,239.72 for documented medical expenses. However, the judge refused to award any amount on the loss of consortium claim, finding plaintiff failed to *379 prove a loss by a preponderance of the evidence.
This appeal, taken by the School Board, followed. The School Board contests the liability determination and complains that the damage award is too high. Plaintiffs answered the appeal, contending the general damage award is too low. Plaintiffs further assert the judge erred in failing to enter a separate award for loss of earning capacity and in finding the evidence did not support an award for loss of consortium.

LIABILITY
Schools have long been held to the same standard of care placed upon the owner of a premises having business invitees. The duty imposed upon a school is one of reasonable care to protect invitees against hazards which create an unreasonable risk of harm. Jones v. City of New Orleans, 559 So.2d 28, 29 (La.App. 4th Cir.1990).
Where, as here, unreasonable risk of harm is at issue, the manifest error standard of review governs the factfinder's determination. Reed v. Wal-Mart Stores, Inc., 97-1174, pp. 3-5 (La.3/4/98), 708 So.2d 362, 364-365; Pesson v. Reynolds, 97-0150, p. 7 (La.App. 1 Cir. 11/13/98), 727 So.2d 507, 511, writ denied, 99-0875 (La.5/7/99), 741 So.2d 657. The manifest error standard of review authorizes this court to reverse a trial court's factual finding only if no reasonable basis for the conclusion exists in the record and the record establishes that the finding is clearly wrong. Stobart v. State, Department of Transportation and Development, 617 So.2d 880, 882 (La.1993); Simpson v. Goodman, 97-2675, p. 4 (La.App. 1 Cir. 12/28/98), 727 So.2d 555, 558. The issue to be resolved by this court is not whether the trier of fact was right or wrong, but whether the factfinder's conclusion was a reasonable one. Id. at 559.
The School Board challenges the trial judge's conclusion that the cart was defective, contending the cart was safe for its intended purposes. The cart, it insists, was built to hold the stage and was leaned against a wall and behind chairs to secure it. The School Board argues it was plaintiffs and the other parents' misuse of the cart that led to plaintiffs injury.
We find no merit to this argument, which ignores the trial judge's factual finding that Mr. Coleman assisted in moving the cart to the center of the room. In so ruling, the judge made a credibility determination, which is clearly supported by the record. The judge found the cart presented an unreasonable risk of danger to plaintiff because it had been moved from its secure location to the center of the floor by Mr. Coleman, who had knowledge of the cart's instability. We find no manifest error in the trial judge's determination that under these circumstances, the cart presented a risk of unreasonable harm to plaintiff.
Next, the School Board insists plaintiff should have been found comparatively at fault, as she made the decision to move the cart and participate in the stage construction even though she had no prior experience. No reasonable person, the School Board urges, would have undertaken this activity without being aware of the possibility of danger, and therefore, some fault for her injuries should be attributed to plaintiff.
The trial judge found as a fact plaintiff did not know of the risk of danger presented by the cart and found she exercised reasonable care in light of the unknown danger of the cart. We find no manifest error in this determination. Therefore, this court may not disturb the trial judge's decision to find the School Board solely at fault in causing plaintiffs injuries.

QUANTUM
With respect to the damage award issues in this case, the record reflects plaintiff was taken to the emergency room immediately after the accident, where X-rays *380 were taken of her right index finger and her foot. Plaintiff sustained a laceration to her right finger requiring 7-10 stitches, as well as a hairline fracture to the right finger. She wore a splint on her hand for four to six weeks. Her right foot was badly bruised, requiring her to walk on crutches for one week. According to plaintiff, she walked with a limp for over two months following the accident, and continues to experience pain in her right foot if she is on her feet for long periods of time.
Medical evidence revealed that plaintiff has a permanent injury to her right index finger. According to Dr. Roch Hontas, who examined plaintiff over three years after the accident, plaintiff suffered nerve damage in her right index finger. He described her condition as "chronic mallet finger deformity" which prevents her from completely straightening or extending her finger. Rather, there is a slight amount of drift to the tip of her finger towards the thumb, and her finger is in a bent position. Because of this condition, he gave her a 22% permanent partial disability rating of the finger. He explained the only surgical option available for plaintiff is an arthrodesis, or fusion of the joint, which may eliminate her pain and improve the appearance of her finger. However, the fusion would leave the joint completely stiff, and actually increase her disability rating, requiring plaintiff to give up some of the mobility she has in the joint in order to obtain a partial recovery. Plaintiff declined to have this surgery.
Plaintiff testified that for two months after the accident, she had to keep her hand elevated constantly because of the pain. Because of the finger deformity, she can no longer pitch a baseball to her sons and she has difficulty doing needlepoint and typing.
With respect to the loss of consortium claim, the evidence showed that following the accident, plaintiff's mother and sister came to her home and took care of her household duties. Her husband, Mark, testified that if his mother and sister-in-law could not help out, he did; however, he did not describe exactly what tasks he performed. Similarly, he stated in a vague manner that he took his children places on the weekends, and estimated he was inconvenienced by his wife's disability for about six weeks.
On the loss of earning capacity claim, the record reflects that plaintiff never was employed at any job prior to the accident. Thereafter, she did work at Elmer's Candy Company for about 13 months as a candy packer, earning $4.45 an hour. Plaintiff did not claim to be unable to work. Rather, she admitted purely as a matter of personal preference, she had no intention to reenter the work force until her youngest child (then 12 years old) turned 18.
In support of this claim, plaintiff submitted only the deposition testimony of Dr. Cornelius Gorman, a vocational rehabilitation counselor. Dr. Gorman came up with two figures for lost earning capacity, one at $104,000.00 and the other at $72,816.00. In arriving at these figures, he considered plaintiff would be out of the labor market voluntarily to raise her children for five to six years. In the first "model" he assumed plaintiff could work a full-time work week at the minimum wage. He then took her candy packing job, which he translated into "today's dollar" at $6.00 an hour, comparing that to the typical minimum wage job to arrive at the $104,000.00 figure. For the second "model," he assumed plaintiff could only work part-time at a minimum wage job.
In light of the above facts, we first address the trial judge's general damage award of $30,000.00 for pain and suffering associated with the injury to plaintiffs finger, her ankle sprain, permanent scarring, disfigurement, disability and impairment to earning capacity. Defendant insists the sum is abusively high, contending the finger deformity is nothing more than a "distraction" to plaintiff's daily activities. Plaintiff, on the other hand, insists that *381 sum is abusively low, and should be raised to at least $60,000.00, exclusive of loss of earning capacity.
The discretion vested in the trier of fact in fixing a general damage award is great and "even vast," so that an appellate court should rarely disturb an award of general damages. Youn v. Maritime Overseas Corporation, 623 So.2d 1257, 1261 (La.1993), cert. denied, 510 U.S. 1114, 114 S.Ct. 1059, 127 L.Ed.2d 379 (1994). The role of an appellate court in reviewing damages is not to decide what it considers to be an appropriate award, but rather, to review the exercise of discretion by the trier of fact. Id. at 1260. It is only when the award is, in either direction, beyond that which a reasonable trier of fact could assess for the effects of the particular injury to the particular plaintiff under the particular circumstances that the appellate court should increase or decrease the award. Id. at 1261.
We find the $30,000.00 general damage award to be well within the vast discretion afforded to the trial judge in rendering such an award under the circumstances of this case. Therefore, this court may not increase or decrease that award.
Furthermore, we find no error in the trial judge's failure to enter a separate award for loss of earning capacity. Dr. Gorman's models were based on assumptions not supported by medical testimony. Furthermore, although he offered dollar amounts based on projections into the future, Dr. Gorman was a vocational rehabilitation counselor, not an economist. As plaintiff admitted she would not enter the labor force for six years, any attempt to predict what she would be capable of earning six years into the future over her remaining 18-year work life would be speculative at best. Therefore, we find the judge did not err in rejecting the figures propounded by Dr. Gorman for loss of earning capacity.
Lastly, we agree with the trial court's conclusion that plaintiff failed to offer sufficient evidence to support an award for loss of consortium. Mark Kugler's testimony on this issue was vague and did not establish a compensable loss.

CONCLUSION
Based on the foregoing, the judgment appealed from is affirmed. Costs of this appeal are assessed to defendant.
AFFIRMED.