# STATE OF LOUISIANA
# COURT OF APPEAL, THIRD CIRCUIT

## CA 07-120


**NORA MILLER, ET VIR**

**VERSUS**

**LAMMICO, ET AL.**


**\*\*\*\*\*\*\*\*\*\***


APPEAL FROM THE
FOURTEENTH JUDICIAL DISTRICT COURT
PARISH OF CALCASIEU, NO. 01-5017
HONORABLE ROBERT LANE WYATT, DISTRICT JUDGE

**\*\*\*\*\*\*\*\*\*\***


**BILLY HOWARD EZELL**
**JUDGE**

**\*\*\*\*\*\*\*\*\*\***


Court composed of Michael G. Sullivan, Billy Howard Ezell, and J. David Painter, Judges.


**AFFIRMED AS AMENDED.**


**Richard B. Cappel**
**Raggio, Cappel, Chozen and Berniard**
**P. O. Box 820**
**Lake Charles, LA 70602**
**(337) 436-9481**
**Counsel for Defendants/Appellees:**
**St. Paul Fire & Marine Insurance Company**
**Dr. Charles Brdlik**
**Dr. Robert Neal Brown**

**John Gregory Bergstedt**
**Bergstedt Law Firm**
**One Lakeshore Drive, #800**
**Lake Charles, LA 70601**
**(337) 436-4600**
**Counsel for Third-Party/Appellees:**
**Louisiana Medical Mutual Insurance Company**
**Johnny R. Biddle, Jr., M.D.**

**Milo Addison Nickel, Jr.**
**Nickel Law Firm**
**P. O. Box 809**
**Rayne, LA 70578**
**(337) 334-1900**
**Counsel for Third Party/Appellant:**
**Louisiana Patient's Compensation Fund**

**Todd A. Townsley**
**Townsley Law Firm**
**3102 Enterprise Blvd.**
**Lake Charles, LA 70601**
**(337) 478-1400**
**Counsel for Plaintiffs/Appellees:**
**Timothy Miller**
**Nora Miller**

**Edmund M. Thomas**
**6104 Line Avenue, Ste. 4**
**Shreveport, LA 71106**
**(318)219-9888**
**Counsel for Plaintiffs/Appellees:**
**Timothy Miller**
**Nora Miller**

**Nadia Marie de la Houssaye**
**Perret Doise**
**P. O. Drawer 3408**
**Lafayette, LA 70502-3408**
**(337) 262-9000**
**Counsel for Third-Party/Appellant:**
**Louisiana Patient's Compensation Fund**

**EZELL, JUDGE**.

In this medical malpractice case, Dr. Charles Brdlik, Dr. Neal Brown, their insurer, and the Louisiana Patient's Compensation Fund (PCF) appeal the decision of the jury below finding in favor of the Plaintiffs, Nora Miller and Timothy Miller. For the following reasons, we affirm the decision as amended.

After several years of trying unsuccessfully to get pregnant, including by in vitro fertilization, Nora Miller became pregnant in 1997 at the age of 39. She delivered a healthy baby boy by caesarian section at Women's and Children's Hospital on December 31 of that year. The c-section was performed by her OB-Gyn, Dr. Johnny Biddle. Around January 4, 1998, she began to suffer abdominal pain and a fever of 102.6 degrees. She was placed on antibiotics and instructed that she could no longer breast-feed her baby. Her breast milk was pumped and discarded. Between January 4 and January 14, she continued to suffer abdominal pain, often screaming due to the intensity, which she rated as a nine out of ten. She also continuously ran a fever, which at one point reached as high as 105 degrees. Despite her fever and pain, as well as a pelvic CT scan that indicated a possible infection, Dr. Biddle did no pelvic exam on her. At one point, he went over fifty hours without even seeing her. Dr. Biddle discharged Mrs. Miller from Women's and Children's on January 14, 1998, her fever and pain unexplained and unresolved.

At home, Mrs. Miller continued to get worse. Her fever and pain continued unabated. She could barely walk. Mr. Miller took her to St. Patrick Hospital, where she was admitted for treatment. Dr. Biddle ordered another CT scan of Mrs. Miller's abdomen and pelvis, which was performed on January 18 by Dr. Brown, and a

1

gallium scan, which was performed by Dr. Brdlik between January 20 and 23. Dr. Brown described some abnormalities in his report but made no conclusions or recommendations for Dr. Biddle. Dr. Brdlik reported the findings of his scan to be normal and showing no signs of infection, although he would later admit this was incorrect. Dr. Biddle again discharged Ms. Miller from the hospital with pain and fever.

Back at home, Mrs. Miller continued to get worse. She remained in bed with pain and fever, unable to take care of her child. This progressed to the point that Mr. Miller felt as if she were going to die. He took Mrs. Miller to get a second opinion from Dr. Randall Wagman. Mrs. Miller was so ill that he had to carry her into Dr. Wagman's office. After a cursory physical exam, Dr. Wagman concluded that Mrs. Miller probably had a pelvic abscess. He ordered radiological scans which revealed a massively infected pelvis. Mrs. Miller was admitted to West Calcasieu Cameron Hospital under the care of Dr. Ben Darby. An emergency D&C was performed on January 31, 1998. Due to the damaged and necrotic nature of her tissue, Mrs. Miller began to bleed severely during the procedure. To help stem the bleeding, a laparotomy was performed wherein Mrs. Miller's uterus was removed. After over thirty days of infection, the uterus was distorted and necrotic to the point that it literally fell apart as it was removed from her body. The abscess surrounding the uterus had adhered to the walls of Mrs. Miller's bowels, requiring careful separation to prevent further damage to them. Dr. Darby told the Millers that Mrs. Miller had been three to seven days from death, had she not been treated.

In July of 1998, the Millers filed suit against Drs. Biddle, Brdlik, and Brown. Dr. Biddle admitted fault and paid the Millers $100,000.00. The PCF thus became liable for any judgment against him greater than that amount. Dr. Brdlik admitted to

2

committing negligence in the reading of the gallium scan and a directed verdict was entered against him on that issue. After hearing the facts of this case and the testimony of experts from both sides, the jury returned a unanimous verdict in favor of the Millers. The jury apportioned fault eighty percent to Dr. Biddle, ten percent to Dr. Brown, and ten percent to Dr. Brdlik. Monetary damages totaling over $866,000.00 were awarded, then reduced by the trial court in compliance with the Louisiana Medical Malpractice Act to $566,400.05, including past and future medical expenses. However, the trial court ordered the judgment to be written so that both Dr. Brown and Dr. Brdlik would be liable for ten percent of the judgment prior to the reduction of the cap, or roughly $86,600.00. The PCF, after a $100,000.00 credit for the money already paid by Dr. Biddle, would be liable for $271,840.04. From this decision, Dr. Brown, Dr. Biddle, their common insurer, and the PCF appeal.

The PCF asserts as its sole assignment of error that the jury abused its discretion in awarding damages. Dr. Brown and Dr. Brdlik jointly assert five assignments of error on appeal. They claim that the jury erred in finding that Dr. Brdlik's admitted breach of the standard of care caused harm to the Plaintiff; that the jury erred in finding that Dr. Brown breached the standard of care and that that breach caused harm to the Millers; that the jury erred in apportioning fault among the Defendants; that the jury abused its discretion in awarding damages;[1] and that the trial court erred in approving a form of judgment resulting in monetary awards against Drs. Brown and Brdlik disproportionate to the ten percent fault allocated to each of them.

Appellate review of factual determinations is governed by the manifest error standard of review. Under that standard of review, set forth in *Stobart v. State,*

---

[1] Because of the obvious similarity between this assignment of error and that set forth by the PCF, we shall address these assignments of error together.

3

*Through Department of Transportation and Development*, 617 So.2d 880 (La.1993), this court may only reverse a factual determination if we find from the record that (1) no reasonable basis exists for the finding and (2) the finding is clearly wrong or manifestly erroneous. The issue to be resolved by this court is not whether the trier of fact was right or wrong, but whether the factfinder's conclusion was a reasonable one. *Simpson v. Goodman*, 97-2675, p. 4 (La.App. 1 Cir. 12/28/98), 727 So.2d 555. Under the manifest error standard of review, the appellate court may not overturn the factual findings of the trial court when there is conflicting evidence. Where there is a conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even though the appellate court may feel that its own evaluations and inferences are as reasonable. *Brown v. Seimers*, 98-694 (La.App. 5Cir. 1/13/99), 726 So.2d 1018, *writ denied*, 99-430 (La.4/1/99), 742 So.2d 556. Likewise, apportionment of fault is a finding of fact and is, therefore, reviewed pursuant to the manifest error-clearly wrong standard of review. *Broussard v. Family Dollar Store*, 05-645 (La.App. 3 Cir. 12/30/05), 918 So.2d 1148, *writ denied*, 06-303 (La. 4/28/06), 927 So.2d 287.

Dr. Brdlik first claims that the jury erred in concluding that his admitted breach of the standard of care in improperly reading the gallium scan caused Mrs. Miller harm. He claims that because Mrs. Miller's uterus was unsalvageable prior to the time he completed the scan, she suffered no injury from his failure to find the infection. We could not disagree more.

The jury heard conflicting expert testimony between Dr. James Brown, an expert for the defense, and Dr. Bruce Halbridge, the Millers' own expert, concerning the time the advancing necrosis rendered Mrs. Miller's uterus incapable of being

4

saved.[2] However, even accepting as true Dr. Brdlik's position that the uterus was unsalvageable by the time he negligently misread Mrs. Miller's "absolute no-brainer" of a scan, it is clear from the record that Mrs. Miller suffered due to Dr. Brdlik's failure to act within the appropriate standard of care. Her infection continued to fester inside her to the point of mastication of her uterus, so that it fell apart upon removal and had to be taken out in pieces. She continued to suffer high fevers, nausea, and vomiting. She could not get out of bed nor bond with her child as the infection progressed further. When the infection and abscess were finally correctly diagnosed almost two weeks after Dr. Brdlik's admitted mistake, she required two additional surgeries to address the problem. During these, she took fourteen units of blood due to blood loss resulting from the advanced decomposition of the uterus and surrounding blood vessels. The average woman typically has only twelve units of blood in her entire body. Dr. Halbridge testified that had the surgery been performed earlier, it would have been far better for Mrs. Miller, even had her uterus required removal, as the tissue and blood vessels surrounding the uterus would have had more integrity and would suture easier, resulting in less blood loss. In fact, Mrs. Miller's infection was allowed to continue to advance after Dr. Brdlik incorrectly read her scan to the point that she was three to seven days away from death. To assert that this is not harm is absurd to the point of approaching frivolity. This assignment of error is devoid of merit.

Next, Dr. Brown claims that the jury erred in finding he breached the standard of care and that any breach caused Mrs. Miller harm. Again, we disagree. Dr. Jacques de la Bretton, the radiologist on Dr. Brown's medical review panel, testified that the CT scan performed by Dr. Brown on January 18 revealed abnormalities not

---

[2]Dr. James Brown felt that the uterus was beyond the point of being saved on January 17, 1998, while Dr. Halbridge felt that it could have been saved until January 21.

described in his report, including several collections of fluid and mesentery stranding. He testified that these would be indicators of infection. He testified that this would indicate a present danger to Mrs. Miller and would warrant a call to Dr. Biddle to discuss the findings. In fact, Dr. de la Bretton testified that he felt Dr. Brown had a duty to call Dr. Biddle. Dr. Biddle did not do so.

Dr. Mark Collins also testified that the CT showed signs of an inflammatory reaction and abnormal fluid collection indicating a blockage or abscess. He stated that while Dr. Brown's report did correctly note some fluid and enlarging of the uterus, it failed to note inhomogeny of the uterus (an indicator of an invasion of the uterus), periuterine inflammatory reaction, and periuterine stranding. Dr. Collins testified that it is imperative that these changes be mentioned and that their omission is a breach of the standard of care. He also testified that, based on the results of the CT scan, the standard of care dictated a call to Dr. Biddle.

While Dr. Brown had expert testimony of his own claiming he did not breach the standard of care in reading or reporting the findings of the CT scan he performed, it is clear from their decision that the jury found the testimony of the Millers' experts to be more credible. As noted above, where there is a conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even though the appellate court may feel that its own evaluations and inferences are as reasonable. *Brown*, 726 So.2d 1018. It is clear that there exists a reasonable factual basis for the jury's determination that Dr. Brown breached the standard of care. Accordingly, its findings cannot be manifest error. Furthermore, for all the reasons discussed above concerning Dr. Brdlik, it is clear that this breach caused harm to Mrs. Miller. This assignment of error is also without merit.

6

Next, Dr. Brown and Dr. Brdlik claim that the jury erred in apportioning them each with ten percent fault for Mrs. Miller's injuries.  Again, apportionment of fault is a finding of fact and is, therefore, reviewed pursuant to the manifest error-clearly wrong standard of review. *Broussard*, 918 So.2d 1148.  It is clear from a reading of the record that the majority of fault lies with Dr. Biddle.  He showed a near complete and utter lack of competence in his handling of Mrs. Miller.  He allowed the infection to fester despite the fact that he should have known about it as early as January 4, when the record shows she would have had a near ninety percent chance of complete recovery.  He never did a pelvic exam on Mrs. Miller, nor did he make a competent effort to determine the source of the infection.  He went fifty hours without seeing a patient suffering from a 105 degree temperature, and he discharged her from the hospital despite her fever and pain.  In all, Dr. Halbridge enumerated over twenty breaches of the standard of care by Dr. Biddle.  However, it is also clear from the record that should Dr. Brown have correctly read his CT scan and brought the evidence of pelvic infection up with Dr. Biddle, Dr. Biddle could have determined the source of the infection and begun proper treatment.  Likewise with Dr. Brdlik's incorrect reading.  Instead, the breaches of the standard of care by both Dr. Brown and Dr. Brdlik allowed the infection to continue to develop.  The record shows a reasonable factual basis for the findings of the jury that Dr. Brown and Dr. Brdlik were each ten percent at fault.  Again, we can find no manifest error in that decision.

Dr. Brown, Dr. Brdlik, and the PCF next claim that the jury awarded exorbitant damages to the Millers.  Once more, we disagree.  As noted by this court in *Manning v. Barrilleaux*, 06-1394, pp. 2-3 (La.App. 3 Cir. 3/7/07), 952 So.2d 919, 920.

> General damages include an award for the victim's pain and suffering, and as such, are intrinsically speculative and not subject to mathematical certainty.  *Wainwright v. Fontenot*, 00-0492 (La.10/17/00), 774 So.2d 70.  We review the trial court's general

7

damage award using the abuse of discretion standard set forth in *Coco v. Winston Industries, Inc*., 341 So.2d 332 (La.1976). The trier of fact is afforded much discretion in independently assessing the facts and rendering an award because it is in the best position to evaluate witness credibility and see the evidence firsthand. *Anderson v. New Orleans Pub. Serv., Inc*., 583 So.2d 826 (La.1991). The award should be based on the facts and circumstances of the particular case. *Id.* Only if we find that the trier of fact abused its discretion, may we lower to the highest reasonable amount or raise the award to the lowest reasonable amount and resort to prior awards to the extent that is reasonably within our discretion. *Youn v. Maritime Overseas Corp*., 623 So.2d 1257 (La.1993), *cert. denied*, 510 U.S. 1114, 114 S.Ct. 1059, 127 L.Ed.2d 379 (1994).

In essence, Dr. Brown, Dr. Brdlik, and the PCF argue that Mrs. Miller was given an award far out of line with other cases involving hysterectomy and the loss of fertility, especially since she had fertility problems in the past. However, based on the particular facts of this particular case, we must disagree.

Mrs. Miller suffered far more than simply undergoing a hysterectomy. She suffered a severe infection for thirty-two days that came close to ending her life. The extreme physical effects on her body as her uterus literally rotted inside her and the pain she endured have already been discussed above and need no further repeating.

Additionally, she could be around her child only for the first three days of his life. Thereafter, she could not be around him due to her pain, her fever, and fear of possible contagion. Due to the infection, she could not bond with her child through breast feeding, as her milk had to be pumped and discarded. She could not even hold her child until she had completely recovered from her hysterectomy, several weeks after it was performed. By the time she could start acting like a mother, her child did not recognize her and treated her as a stranger. She felt like a bad mother, became depressed, and suffered from a low libido. These problems began to strain the Millers' marriage. These problems still remained at the time of trial, when she was still being treated with anti-depressants. Both the Millers wanted additional children,

and they had planned on trying as soon as they could to add to their family. And while they acknowledge their chances may have been small, those chances were completely destroyed by the negligence of the Defendants. Mr. Miller was off work tending to her and the child for over two months, and Mrs. Miller, who had served nineteen-and-a-half years in the United States Navy, took so long to recover from her injuries that she could not return to the Navy in time to serve the remaining six months she needed to retire with a Navy pension. Based on the particular injuries suffered by these particular Plaintiffs, we cannot say that the jury abused its great discretion in making its award.

Finally, Dr. Brown and Dr. Brdlik claim that the trial court erred in approving a judgment form wherein the ten percent liability they were assessed was applied to the judgment prior to the reduction to the statutory cap, thereby rendering monetary awards against them disproportionate with their assigned fault. We agree that the trial court committed error in this regard.

Louisiana Revised Statutes 40:1299.42(B)(1) provides that "[t]he total amount recoverable for all malpractice claims for injuries to or death of a patient, exclusive of future medical care and related benefits as provided in R.S. 40:1299.43, shall not exceed five hundred thousand dollars plus interest and cost." This $500,000.00 cap is subject to a $100,000.00 previously paid settlement credit. La. R.S. 40:1299.42(D). Louisiana Civil Code Article 2323, entitled "Comparative Fault," provides in pertinent part:

> A. In any action for damages where a person suffers injury, death, or loss, the degree or percentage of fault of all persons causing or contributing to the injury, death, or loss shall be determined, regardless of whether the person is a party to the action or a nonparty, and regardless of the person's insolvency, ability to pay, immunity by statute, including but not limited to the provisions of R.S. 23:1032, or that the other person's identity is not known or reasonably ascertainable. If a person suffers injury, death, or loss as the result partly of his own

9

negligence and partly as a result of the fault of another person or persons, the amount of damages recoverable shall be reduced in proportion to the degree or percentage of negligence attributable to the person suffering the injury, death, or loss.

B. The provisions of Paragraph A shall apply to any claim for recovery of damages for injury, death, or loss asserted under any law or legal doctrine or theory of liability, regardless of the basis of liability.

Under the judgment selected and signed by the trial judge, the fault allocated to Dr. Brown and Dr. Brdlik was assessed against the entire, original judgment of $866,400.00, rather than against the judgment after the reduction to the statutory cap. This means that they are each liable for $86,640.00 for their ten percent fault under the judgment below. However, as the judgment was reduced to $566,400.05, including past and future medical expenses, Dr. Brown and Dr. Brdlik would end up paying far greater than their proportionate share of the damages allowed by law. Likewise, the PCF would receive a windfall of roughly $80,000.00, despite the overwhelming negligence of Dr. Biddle, in whose place it stands.

The trial court's judgment was based on the Louisiana Supreme Court decision of *Hall v. Brookshire Brothers, Ltd.*, 02-2404 (La. 6/27/03), 848 So.2d 559, wherein the supreme court ruled that in cases involving comparative negligence assigned to the victim of medical malpractice, comparative fault was to be calculated before imposing the damages cap, so as to prevent a double reduction of damages to the victim - once by his own fault and once by the legislatively imposed cap on medical malpractice damages. However, we find this case to be distinguishable from the matter at hand, as no fault was assigned to the Millers by the jury. Accordingly, there is no risk of double reduction and the ordinary rules of comparative fault should apply among the negligent Defendants.

After reducing the damage award to the statutory cap, Dr. Brown and Dr.

10

Brdlik would each owe ten percent of $500,000.00, or $50,000.00. The PCF, which was liable for Dr. Biddle's negligence, would owe $300,000.00, after receiving the credit for the $100,000.00 already paid by Dr. Biddle. Additionally, Dr. Brown and Dr. Brdlik would each owe ten percent of the $66,400.05 in past and future medical expenses, or $6,640.01. The PCF would be liable for the remaining $53,120.03 in medical expenses. Accordingly, the judgment from the trial court below is amended as to the amount of damages owed by each Defendant, and judgment is hereby rendered against Dr. Brown in the amount of $56,640.01, against Dr. Brdlik in the amount of $56,640.01, and against the PCF in the amount of $353,120.03. The decision of the trial court is affirmed in all other aspects.

In accordance with the above reasons, the judgment of the trial court is hereby affirmed in part, reversed in part, and rendered. Judgment is hereby rendered in favor of the Plaintiffs as follows: against Dr. Brown in the amount of $56,640.01, against Dr. Brdlik in the amount of $56,640.01, and against the PCF in the amount of $353,120.03. All awards are made with legal interest thereon from the date of judicial demand until paid. Costs of this appeal are hereby assessed against the Defendants.

**AFFIRMED AS AMENDED.**