JjDfeEW, J.
Plaintiff, Josephine Wesley, appeals from the grant of summary judgment in favor of defendants, Food Bank of Northeast Louisiana, Inc. .(Food Bank) and its liability insurer, CGU Insurance Company (CGU). For the following reasons, we reverse and remand.
FACTS
This is an action to recover damages for personal injuries sustained by Ms. Wesley after she fell off a loading ramp at the Food Bank. Because the case was decided on summary judgment, the facts available for review come primarily from the depositions of the plaintiff and witnesses.
Ms. Wesley was an occasional volunteer at the Food Bank, having worked there one day per week for a period of about two months. Her tasks primarily consisted of placing cans or packages of food in boxes for distribution. Much of the food in the Food Bank’s large warehouse is stored in cases stacked on wooden pallets. These pallets occasionally had to be moved from one part of the warehouse to another by forklift or pallet jack, but moving the pallets was apparently supposed to be done by full-time Food Bank employees trained in the use of the equipment and not by the volunteers. Ms. Wesley said that she had never used a pallet jack prior to the day of her accident.
On the afternoon of July 10, 2000, Ms. Wesley and her sister, Jennatt Jackson, were at the Food Bank. They both stated in their respective depositions that they had been doing volunteer work that day. At approximately 3:00 that afternoon, Ms. Jackson was-in the process of retrieving a load of “spoiled” food to take to her farm for use as animal feed. [?The spoiled food had been placed in a box and was ready to be transported, by forklift, out of the warehouse loading dock, down a ramp and placed into the bed of Ms. Jackson’s pickup truck waiting outside. The forklift driver was Chyvis Turner, a full-time Food Bank employee. Ms. Wesley said that before she and her sister could take the food, the Food Bank had to weigh it. The Food Bank scale was near the doorway of the loading area of the warehouse. Ms. Wesley stated that the doorway was partially blocked by a barrel sitting on a manual pallet jack. She added that her sister had earlier used the pallet jack to move the *21 barrel “with that broken glass and stuff in it” from the doorway of the loading bay near the scale and-that Mr. Turner was having difficulty maneuvering the forklift around the pallet jack.
Ms. Jackson, who claimed wide experience with manual pallet jacks, testified in her deposition:
The manual pallet jack, I had it with the barrel on it. She never touched it the whole time that I saw her. I brought it •out and put — I parked it on one side of the scales way away from where Chyvis had to go with the forklift. Way out of the way.
According to Ms. Wesley, she pushed the pallet jack to clear a path for Mr. Turner’s forklift, and then once he passed, she pulled it toward her to return the pallet jack to its original spot. The pallet jack apparently continued rolling past the intended stopping point, as Ms. Wesley testified, “The hydraulic jack pushed me off the ramp. I didn’t just fall. It shoved me.” Ms. Wesley gave this detailed account of the incident in her deposition:
I was standing right in the door and the hydraulic jack was sitting' there, but it was sitting like Chyvis was trying to get it around.' He was trying to get — he was on the forklifter (sic) and |she was trying to get around the hydraulic jack to weigh the big old box and he kept-on struggling, and I asked him, I said, ‘Chyvis, do you want me to move it a little bit?’. And he kept looking down and turning and I said ‘well, I’ll just kind of move it a little bit.’ So I pushed it out of the way a little bit and he come around and put the box on the scale. So as he weighed the food he took it off and he went down the ramp to put it on the truck, and I was still standing there and I said, well, let me move it back in the position it was in so when he come back up he could, you know, get back up with the forklifter (sic) and come around and weigh the barrel because it was a barrel sitting waiting to be weighed, too, and I went to shove it back a little bit and it took off, and when it did I didn’t have no, you know — I had it like this (indicating) but it, — you know, I couldn’t hold on to nothing or nothing. It just throwed (sic) me over the ramp on this right arm here.
Ms. Wesley received several injuries as a result of her fall, including a broken right arm and suffered pain in her right knee, back and pelvis. At the September 2001 deposition she said that her pain still continued, particularly in her lower back, right shoulder and arm, and pelvis. Pain limited her ability to move her right arm.
Mr. Turner testified in his deposition that he first became aware of the accident when he heard a loud rumbling noise while he was loading a pallet of spoiled food into the bed of Ms. Jackson’s pickup truck. He said that he turned around and saw the pallet “rolling down the dock by itself’ and also saw Ms. Wesley’s legs as she fell over the loading ramp. Ms. Wesley’s sister, Ms. Jackson, recalled the incident somewhat differently; at her deposition, she said that when Ms. Wesley fell, Mr. Turner had not yet driven the forklift down the ramp. However, Ms. Wesley testified that her sister and Mr. Turner were both at her sister’s truck, loading a box, when she fell off the ramp.
|4Ms. Wesley filed suit against the Food Bank and its insurer alleging in part that the defendants created an unreasonable yet foreseeable risk of harm to her, that they failed to exercise reasonable care, that they allowed her to move the pallet jack without prior experience, and exposed her to risks beyond the scope of her background or work experience. After depositions were taken, the defendants filed a motion for summary judgment. Ms. Wes *22 ley opposed the motion for summary judgment and in her opposition she included the depositions, the defendants’ responses to interrogatories and a set of photographs of the loading dock and the pallet jack. The motion was submitted to the trial court on briefs, and the court granted summary judgment in favor of the defendants, dismissing Ms. Wesley’s lawsuit. The trial court cited Holmes v. Cromwell & Spencer Lumber Co., 51 La. Ann. 352, 25 So. 265 (1899), and Lynch v. Cities Service Refining Corp., 52 So.2d 456 (La.App. 1st Cir.1951), for the proposition that Ms. Wesley was required to show that the defendants had behaved with gross negligence by willfulness and wantonness. The trial court found that Ms. Wesley had not met this burden and that she had been injured as the result of her own negligence.
DISCUSSION
Summary judgment shall be rendered if the pleadings, depositions, answers to interrogatories, admissions on file, and any affidavits, show that there is no genuine issue of material fact and that the mover is entitled to judgment as a matter of law. La. C.C.P. art. 966. The mover has the burden of establishing the absence of a genuine issue of material fact. If the mover [¿will not bear the burden of proof at trial on -the matter, then he is required to point out to the court the absence of factual support for one or more elements essential to the adverse party’s claim or action. La. C.C.P. art. 966(C)(2).
The party opposing summary judgment cannot rest- on the mere allegations of his pleadings, but must produce factual support sufficient to establish that he will be able to satisfy his evidentiary burden of proof at trial. If he does not produce such evidence, then there is no genuine issue of material fact, and the mover is entitled to summary judgment. La. C.C.P. arts. 966(C)(2). Appellate' courts review summary judgments de novo under the same criteria that govern the district court’s consideration of whether summary judgment is appropriate. NAB Natural Resources v. Willamette Industries, Inc., 28,555 (La.App.2d Cir.8/21/96), 679 So.2d 477.
We are mindful. of the purpose of a motion for summary judgment as stated in Johnson v. Entergy Corp., 36,323 (La.App.2d Cir.9/20/02), 827 So.2d 1234, 1237:
The purpose of the motion for summary judgment is to weed out those cases where it is obvious that the evidence, even if accepted as true, is insufficient to establish an essential element of a party’s case. Therefore, irrespective of the legislature’s mandate ‘that summary judgments are now favored, the trial court cannot make credibility determinations when considering such motions. The court should draw those inferences from the undisputed facts which are most favorable to the party opposing the motion for summary judgment since summary judgments deprive the litigants of the opportunity to present their evidence to a jury and should be granted only when the evidence presented at the motion for summary judgment establishes that there is no genuine issue of material fact in dispute. Independent Fire Ins. Co. v. Sunbeam Corp., 99-2181, 99-2257 (La.2/29/00), 755 So.2d 226; Knowles v. McCright’s Pharmacy, Inc., 34,559 (La.App.2d Cir.4/4/01), 785 So.2d 101.
Although Ms. Wesley gave her opinion that the pallet jack pushed her off the loading dock, we do not find that she is claiming under La. C.G. art. 2317.1 that the pallet jack was defective. Unlike the cart in Kugler v. Tangipahoa Parish School Board, 99-0016 (La.App. 1st Cir.2/18/00), 752 So.2d 375, there is no *23 evidence that the pallet jack itself was defective and for that reason contributed to Ms. Wesley’s accident. In the absence of any testimony describing the pallet jack as broken or damaged, we consider Ms. Wesley’s claim to sound essentially in ordinary negligence.
Since the decisions in Holmes, supra and Lynch, supra, Louisiana has adopted a comparative fault scheme whereby even a party who is partly responsible for his damages may recover, in proportion to the parties’fault, a portion of his damages from the other tort-feasor. La. C.C. art. 2323. However, in order to recover, under the duty-risk analysis, a plaintiff must prove five separate elements:
(1) the defendant had a duty to conform his or her conduct to a specific standard of care (the duty element); (2) the defendant failed to conform his or her conduct to the appropriate standard of care (the breach of duty element); (3) the defendant’s substandard conduct was a cause-in-fact of the plaintiffs injuries (the cause-in-fact element); (4) the defendant’s substandard conduct was a legal cause of the plaintiffs injuries (the scope of protection element); and (5) actual damages (the damage element).
Pinsonneault v. Merchants & Farmers Bank & Trust Co., 01-2217 (La.4/3/02), 816 So.2d 270, 276.
 Although Ms. Wesley had been volunteering her services at the Food Bank on the day of the accident, her presence at the loading dock at the time |7of the accident was unrelated to her volunteer work.[1] She was still present at the warehouse because her sister was gathering an assortment of food to take home. Under the circumstances, we believe that she may be considered a business invitee. In general, the owner of a facility has the duty of exercising reasonable care for the safety of persons on his premises and the duty of not exposing such persons to unreasonable risks of harm. Holmes v. Harper, 34,631 (La.App.2d Cir.5/9/01), 786 So.2d 245, 248.
Mr. Turner testified that there was no need for volunteers to work around the loading docks. He stated that volunteers were ordinarily not allowed around the loading docks because of the hazard involved, although he was never told that this was the Food Bank’s policy.[2] He also said, over the objection of defendants’ counsel, that in his opinion it was unsafe for volunteers to use the pallet jacks because they did not have the proper training. There were no visible warnings at the Food Bank regarding the use of the pallet jacks, and Mr. Turner was never told by his supervisors that only employees could use the pallet jacks. Mr. Turner testified that he had never known of a volunteer using a pallet jack.
*24 Ms. Jackson testified that she had been working as a volunteer at the Food Bank for a little over a week on the date of the accident, and that she,|shad been picking up damaged products from there for three to four years. On the date of the incident, Ms. Jackson had used the manual pallet jack to move a barrel containing trash and damaged food out of the way. She recalled that the last time she saw the pallet jack before the incident, it was not in the path of the ramp to the loading dock that the forklift would take. She testified that she had used the manual pallet jack numerous times since she began picking up spoiled food products from the Food Bank several years earlier, and had continued using it after she started volunteering there. Ms. Jackson did not recall anyone at the Food Bank ever telling her not to use the pallet jack, although she was never ordered to use it.
If Mr. Turner was supervising Ms. Wesley’s movement of the jack, then the Food Bank could be responsible for his failure to properly supervise the plaintiff. If a person undertakes a task which he otherwise has no duty to perform, he must nevertheless perform that task in a reasonable and prudent manner. Moore v. Safeway, Inc., 95-1552 (La.App. 1st Cir.11/22/96), 700 So.2d 831, 846, writs denied, 97-2921 (La.2/6/98), 709 So.2d 735, and 97-3000 (La.2/6/98), 709 So.2d 744. In the absence of evidence that Mr. Turner was supervising Ms. Wesley, however, Food Bank cannot be held liable under this theory.
Ms. Wesley admitted that Mr. Turner never asked her to move the pallet jack. Nevertheless, she testified that when she asked him if he wanted her to move the pallet, he never responded to her question. Noise from the forklift apparently would not have prevented him from hearing Ms. Wesley’s alleged question about moving the pallet jack, as Mr. Turner 1 described the propane-powered forklift as having a quiet motor. In any event, according to Ms. Wesley, Mr. Turner did not object to her taking this action. Mr. Turner testified that he did not see Ms. Wesley move the pallet jack to give him room to maneuver the forklift before he went down the ramp. There is clearly a genuine issue of material fact regarding whether Ms. Wesley moved the pallet jack in Mr. Turner’s presence. If such is the case, then Mr. Turner took upon the duty to supervise Ms. Wesley’s use of the pallet jack. Moreover, it would also be a breach of the Food Bank’s duty not to expose Ms. Wesley to unreasonable risks of harm. Mr. Turner recognized the danger of non-employees using the pallet jacks. It will be up to the trier of fact to make the credibility determination between the two versions of the event.
It is of no importance to our analysis that even if Ms. Wesley initially moved the pallet jack in Mr. Turner’s presence, Mr. Turner did not know, what Ms. Wesley was doing after he proceeded down the ramp, which was when she pulled the pallet jack toward herself to return it to its original location. The implication would be that at that point Mr. Turner was no longer in a position to object to Ms. Wesley’s further movements of the pallet jack. However, it would be absurd to suggest that Mr. Turner’s unspoken consent (evidenced simply by a lack of objection) was only valid when Ms. Wesley initially pushed the pallet jack out of the way of Mr. Turner’s forklift, but then this consent dissipated seconds later, again without a signal from Mr. Turner, verbal or otherwise.
|1flDECREE
For the above-assigned reasons, the judgment of the trial court is REVERSED at defendants’ cost.
*25 PEATROSS, J., dissents with written reasons.
KOSTELKA, J., dissents for reasons assigned by Judge PEATROSS.

. The plaintiffs in Holmes v. Cromwell & Spencer Lumber Co., supra, and Lynch, supra, were not volunteers in the sense that they were performing charitable deeds. Instead, each had simply volunteered to perform gratuitous tasks in an employment setting. The plaintiff in Holmes was employed as a log washer on a day to day basis, and was not working on the day he was injured. Holmes, who had been loitering around the sawmill, had answered the call from defendant's locomotive engineer for assistance in loading railroad ties. In Lynch, the plaintiff was connecting pipe lines for his employer on defendant’s property. Lynch was injured when he voluntarily placed his foot against a 55 foot long pipe lying across a road so that a truck owned by defendant could drive over it. See also, Lafont v. Chevron, U.S.A., Inc., 593 So.2d 416 (La.App. 1st Cir.1991).

. Mr. Turner testified that he had never seen a policy manual outlining what the volunteers were permitted or not permitted to do.